FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

97 FEB 19 AM 10: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

DANIELLE HOLDEN, et al.,          )
                                  )
    Plaintiffs,               )
                                  )
    vs.                       )          CV 95-PT-2998-M
                                  )
MITCHELL OIL COMPANY, INC., and   )
BILLY MITCHELL, et al.,           )
                                  )
    Defendants.               )

**ENTERED**

FEB 1 9 1997

---

TRACY BUNCH AND AMY BUNCH,        )
                                  )
    Plaintiffs,               )
                                  )
    vs.                       )          CV 96-S-194-M
                                  )
MITCHELL OIL COMPANY, INC., and   )
BILLY MITCHELL,                   )
                                  )
    Defendants.               )

## Memorandum Opinion

    This motion comes on to be heard on a motion for summary judgment filed by the defendants Mitchell Oil Company, Inc., ("Mitchell Oil") and Billy Mitchell ("Mitchell") on November 26, 1996. In their motion, the defendants contend that neither the claims of the

48

plaintiffs Tracy Bunch ("Mr. Bunch") and Amy Bunch ("Ms. Bunch") for negligence, wantonness, strict liability and loss of consortium, nor the claims of the plaintiff Danielle Holden, ("Ms. Holden") for herself and as Administratrix of the Estate of Greg Holden, for wrongful death and loss of consortium, are supported by a genuine issue of material fact.

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is proper only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ." in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

## Facts

The instant case arises out of an explosion that occurred at the Mitchell Oil bulk plant in Fort Payne, Alabama, on February 6, 1994 while a tank was being repaired by a crew employed by ATC Tank Lining, Inc. ("ATC"), a tank lining company located in Knoxville, Tennessee. In the

2

explosion, one individual, Greg Holden ("Mr. Holden"), was killed and at least one other, Mr.
Bunch, was injured.

On or about February 2, 1994, Mitchell contacted ATC to repair a depression on the top of
a twenty thousand gallon above-ground tank at the Mitchell Oil bulk plant.[1]  Approximately two
years earlier, the tank had been damaged while gas was being pumped from the tank in subfreezing
weather.[2]  The top of the tank became indented and a fitting in the hinged cap used to manually
gauge the amount of gasoline in the tank broke.  As a result, rainwater began to leak into the tank.
Initially, Mitchell attempted to repair the tank by hiring a local painter to patch the tank.
Unfortunately, rainwater continued to leak into the tank.  For the next two years, Mitchell Oil only
intermittently used the tank to store gasoline.

Upon contacting ATC, Mitchell spoke with Mr. Holden who agreed to look at the tank on
his way to a job in Oxford, Alabama.  On February 2, 1996, Mr. Holden left Knoxville for Oxford
with a crew consisting of himself, Mr. Bunch, Robert Wetter and Davis Lewis.[3]  On the way to
Oxford, Mr. Holden called David Booth ("Booth"), the manager of field operations at ATC, to
inform him that the crew would be stopping in Fort Payne to look at a tank for Mitchell Oil.  Mr.
Holden allegedly told Booth that the tank he would be examining was above ground, to which
Booth responded that work on above-ground tanks was foreign to ATC's underground tank lining
business.

Later in the day, Holden and his crew arrived at the Mitchell Oil bulk plant.  While the crew
went inside to use the restrooms, Mr. Holden spoke with Mitchell in the lobby about the job.
Waiting to use the restroom down the hall, Mr. Bunch allegedly overheard Mitchell tell Mr. Holden
that tank number two had been out of service for two years, that it had been cleaned out and that it
was vapor-free and work safe.  After speaking with Mitchell, Mr. Holden allegedly gathered the crew

---

[1] The tank that exploded was one of eight tanks at the bulk plant connected by a visible vapor recovery pipe, the
purpose of which is to collect gasoline vapors and prevent them from escaping into the atmosphere.

[2] The vent, the purpose of which was to maintain equal pressure between the pressure in the tank and the air
pressure outside had frozen over.  As a result, the pressure from the outside air depressed the tank.

[3] Mr. Holden was the foreman of the crew and Robert Wetter was the safety officer for the crew.

3

and relayed the contents of the discussion with Mitchell.[4]

Mitchell then led the crew to the top of the tank. There, the crew first peeled off old fiberglass put on the indentation by the paint contractor. Next, they sandblasted the top of the tank. They then placed a new fiberglass shield over the depression. Once the fiberglass had set, Mr. Holden and his crew continued to Oxford.

Mr. Holden allegedly began work for ATC because his wife's uncle, who then worked at ATC, told him about the position. Mr. Holden, upon taking the position on January 3, 1993, had no experience with lining tanks. However, the defendants assert, Mr. Holden received OSHA compliance safety training that consisted of a forty hour classroom course and twenty-four hours of field supervision required for hazardous materials workers. The plaintiffs assert that this training took place for one week while Mr. Holden and his crew worked on underground storage tanks at a gasoline station. Classroom training occurred in the evening at a motel room. The materials used in the training included NLPA Standard 631 and other documents which had been placed in a three-ring binder. That material has, the plaintiffs assert, nothing to do with above ground tanks. In addition, the materials nowhere state that a tank liner cannot rely upon the representations of the tank owner. Holden also received training from Booth in January 1994 as to safety in tank-lining.

The defendants also state that Holden was aware of ATC's Site Safety and Health plan, which states that a person working on a tank should have vapor-tested the tank atmosphere regardless of any representation that the tank was vapor-free. However, state the plaintiffs, the plan was drafted after Mr. Holden's training. In addition, it is not clear whether it had been instituted by ATC in early February 1994.

Mr. Bunch came to ATC from Chemical Waste Management, Inc., where he had a job as a site excavator. He was hired as a laborer to work on Mr. Holden's crew. According to the defendants, Mr. Bunch had also received OSHA training when he began work for ATC and most

---

[4] The defendant filed a motion in limine arguing that the testimony by Mr. Bunch that he overheard the statement of Mitchell to Mr. Holden is hearsay, because the statement overheard by Bunch goes to the truth of the matter asserted, that the tanks were clean. The purported statement(s) of Mitchell are not hearsay. See FED. R. EVID. 801(d)(2)(A). It is also reasonably arguable that the statement(s) of Mitchell are admissible to show not the truth of what he said, but that he said it. The court does not now reach the issue of whether the statement(s) of Holden are inadmissible. The statement(s) of Holden may possibly be admissible under FED. R. EVID. 804(b)(5).

likely while with Chemical Waste Management. While at Chemical Waste Management, Mr. Bunch allegedly dealt with hazardous waste cleanup. However, he never cleaned out any drums. According to Mr. Bunch, he was never given specific training as to the hazards of lining underground tanks. Allegedly, all of his knowledge came from on-the-job experience.

On the day after Mr. Holden and his crew had installed the fiberglass shield, Mitchell examined the tank and discovered that the fiberglass shield did not entirely cover the depressed area. Mitchell called ATC, which in turn contacted Mr. Holden in Oxford. He then contacted Mitchell by phone. They discussed the problems with the fiberglass shield. In addition, Mitchell requested Mr. Holden to replace the broken cap on the top of the tank. Mr. Holden agreed to replace the cap on Sunday evening, after the Oxford job was completed. Mitchell stated that he would leave the replacement cap sitting atop the tank.

Mr. Holden and his crew arrived at the Mitchell Oil bulk plant on the evening of Sunday, February 6, 1994. Mitchell's cousin opened the gate at the plant for them. Mr. Holden told his crew members that they were to replace the cap on tank two. Initially, they tried to loosen it with a pipe wrench and a crowbar. They then tried to tap the affixed pipe wrench with a three pound hammer. After that failed, Holden attempted to use an air-saw to cut away the threading for the valve cap. Finally, Mr. Holden decided to apply heat to the cap to loosen it.

Mr. Bunch was instructed to bring Mr. Holden the arc welder and hook up the welding leads. After some confusion, the arc welder was prepared. Holden arced the welder three times. On the fourth arc, the tank exploded. Mr. Holden was thrown from the top of the tank and died instantly. Two others, Mr. Bunch and Robert Wetter, were also thrown from the tank, but survived.

## Contentions & Analysis

The defendants argue that they cannot be held liable either for negligence or wantonness because they owed the plaintiffs no duty to insure that the tank would not explode while welding was taking place. The defendants argue that no duty of care is owed by an owner of a premises to protect an independent contractor from injury due to defects or dangers on the owner's property.

5

Glenn v. U.S. Steel Corp., 423 So.2d 152, 154 (Ala. 1982). This rule can be excepted only in situations where the owner of the premises retains the right to control the manner in which the independent contractor's work is done or where the work is inherently dangerous. Pope v. Talledega, 602 So.2d 890, 892 (Ala. 1992).

The defendants contend, first, that they did not exert any control over the manner in which the work on the tank was done. They gave no instructions on how the cap was to be removed and replaced. Nor was any representative of Mitchell Oil present while the work was ongoing. The decision to use the welder was purely that of Mr. Holden.

Second, the defendants argue, the welding on the tank was not inherently dangerous because the work would not have been dangerous had it been performed with the exercise of reasonable care. Holden's crew failed to exercise reasonable care, it is argued, because it did not comply with OSHA regulations for work around a gasoline storage tank. ATC was cited for its employees' failure to exercise care by OSHA after the accident. Reasonable care would have required vapor testing of the tank prior to any welding.

In addition, contend the defendants, the exception for intrinsically dangerous activities is inapplicable in the present case because ATC had responsibility for safety on the job. See Beck v. Olin Co., 437 So.2d 1236, 1239 (Ala. 1993) (holding the inherently dangerous work exception inapplicable in a case where the independent contractor was responsible for safety). According to the defendant, in ATC's site safety plan, Mr. Holden and the crew were charged with the duty of ascertaining the safety of the welding around the tank. Also, allege the defendants, the crew had been trained by Tony Reick to test for vapors in the vicinity of any welding work, regardless of the tank owner's representations. Finally, the crew was instructed to be certain that the vapor recovery system among the tanks was blocked.

The plaintiffs respond, first, that it is not unusual to perform welding atop a tank. In addition, Mitchell knew that Mr. Holden might apply heat to the cap atop the tank in order to loosen it. Mitchell also allegedly knew that the tank was required to be vapor-free before welding occurs. In addition, alleges the plaintiffs, the American Petroleum Institute standard states that the owner of the tank is to state the limits of responsibility of the parties before reconstructive work on a tank occurs. Although the work performed was not wholly reconstructive of the tank, the plaintiffs state, the work was at least partially reconstructive and therefore Mitchell had a duty to state to Mr. Holden that Mr. Holden was responsible for checking the vapors in the tank and

6

insuring that it was clean. Because it was reasonable for Mr. Holden and the crew to believe that absent a contrary representation by the Mitchell, the cleaning of the tanks was Mitchell's responsibility, the plaintiffs may have acted reasonably in performing the welding atop the tank. Because no cleaning or removal of vapors had been performed, the work being performed was inherently dangerous such that the defendant had a duty of care.

Further, the plaintiffs respond, although the determination of safety may originally have been required by the crew, the responsibility to provide a clean and vapor-free tank became Mitchell Oil's responsibility once Mitchell represented to Mr. Holden that the tank was clean. Because the crew's training did not include information on whether the crew was to vapor-test the tank when it is represented to be clean, the responsibility remained with Mitchell to ensure a safe tank upon which to work.

Citing Proctor & Gamble Co. v. Staples, 551 So.2d 949, 953 (Ala. 1989), the defendants state that it is a necessary condition of recovery for intrinsically dangerous work that the defendants exercised control over the job site and the work done. In addition, the defendants maintain that the plaintiffs' reference to the American Petroleum Institute standard is inapposite because the crew was not assigned the task of reconstructing a tank. Finally, the defendants assert, it was ATC which received the citation from OSHA, not Mitchell Oil.

The plaintiffs reply that Mitchell's representation that the tanks were clean gave rise to a duty to insure that the tanks were clean. In Cowley & Brothers, Inc. v. Brown, 569 So.2d 375, 380 (Ala. 1990), the Alabama Supreme Court stated:

> The law imposed no duty upon Cowley's employee to make a statement as the condition of the steel tank. However, once the Cowley employee undertook to make a representation with regard to the condition of the tank, the law required him to speak the truth; thus a question of fact was presented with respect to whether the representation was true or false and whether it was made intentionally, recklessly, negligently, or innocently. Additionally, a fact issue was presented as to whether the plaintiff acted upon the representation.

The defendants state that the Cowley case was a fraud case and is, therefore, inapposite. The court stated, however, "Brown based his claim upon actionable negligence." Id. at 379. The defendants also state that the plaintiff in Cowley was inexperienced at working around flammable vapors. The plaintiff in Cowley was experienced at cutting and did know "that the tanks had to be either steamed or washed with water to the very top so that they would not blow up when one started to cut them." Id. at 378. Finally, the plaintiff in Cowley relied upon the representation of

7

the Cowley employee that the tank had been cleaned. The facts in this case are sufficiently similar.

The defendants also argue that the crew was contributorily negligent in welding on the tank. To show contributory negligence at the summary judgment phase, a defendant must demonstrate that a reasonable trier of fact would find contributory negligence. The crux of the defendants' argument for contributory negligence is that the crew was trained to always vapor-check a tank and that vapor checking is required by ATC's Safety & Site plan. However, the plaintiffs dispute this, arguing that the crew was not trained to disregard owner representations and was not trained by ATC to work on above-ground tanks. Because an issue of fact relevant to the determination of whether the crew knew or should have known to disregard Mitchell's representation exists, summary judgment will be denied on the contributory negligence issue.

## Conclusion

For the foregoing reasons, the motion for summary judgment will be **DENIED**. Since the issues are close, the court will certify the action pursuant to 28 U.S.C. § 1292(b).

This 18 day of February 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE